**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| Mary Cross /O/B/O B.C., | : | Case No. 1:13CV1860 |
| Plaintiff, | : | |
| vs. | : | **MAGISTRATE'S REPORT** |
| | | **AND RECOMMENDATION** |
| Commissioner of Social Security Administration, | : | |
| Defendant. | : | |

Plaintiff seeks judicial review of a final decision of the Commissioner denying his application for

Supplemental Social Security Income (SSI) under Title XVI of the Social Security Act (the Act), 42 U. S.

C. § 1381, *et seq*. and 405(g).  Pending are briefs on the merits filed by both parties and Plaintiff's Reply

(Docket Nos. 16, 17, 18).  For the reasons set forth below, the Magistrate recommends that this Court reverse

and remand the opinion of the Commissioner for further proceedings.

## I. PROCEDURAL BACKGROUND

On April 9, 2010, Plaintiff applied for SSI and any federally administered State supplementation

under Title XVI, alleging that her son B.C. became disabled on April 1, 2010 (Docket No. 11, pp. 153-154

of 538).  Plaintiff's application was denied initially on August 12, 2010, and upon reconsideration on

November 5, 2010 (Docket No. 11, pp. 95-97; 101-103 of 538).  On February 7, 2012, Administrative Law

Judge (ALJ) Valencia Jarvis conducted a hearing at which Plaintiff, represented by counsel, Amena Choudhury, and his mother appeared and testified (Docket No. 11, pp. 34-36 of 538).  The ALJ issued an unfavorable decision on March 19, 2012 (Docket No. 11, pp. 15-27 of 538).  The Appeals Council denied review of the ALJ's decision on June 27, 2013, thus rendering the ALJ's decision the final decision of the Commissioner (Docket No. 11, pp 5-7 of 538).

## II. FACTUAL BACKGROUND.

Plaintiff was born on June 6, 1997, and was 14 years of age at the time of the ALJ's decision (Docket No. 11, pp. 85; 27 of 538).  Plaintiff alleges disability based on alleged mental impairments.  A summary of the evidence follows.

A.    THE ADMINISTRATIVE HEARING

1.    PLAINTIFF'S MOTHER'S TESTIMONY

The first witness to testify was the Plaintiff's mother, Ms. Cross.  She noted her son (B.C. hereinafter) is approximately fourteen years of age and resides in her home (Docket No. 11, pp. 40-41 of 538). Ms. Cross testified that approximately three years ago, B.C. informed her that B.C.'s stepsister had been molesting him while she (Ms. Cross) was away at work (Docket No. 11, pp.41 of 538).  Ms. Cross indicated the molestation dated back to when B.C. was age five (Docket No. 11, pp. 58 of 538).  After learning of the abuse and alerting the authorities, Ms. Cross found out that in addition to being molested, B.C. had been present when his father sexually abused B.C.'s stepsister (Docket No. 11, pp. 41 of 538).  After his father and stepsister were removed from the home, Ms. Cross testified that B.C. experienced shame and had attempted suicide (Docket No. 11, pp. 42-43 of 538).  Following the suicide attempt, Ms. Cross indicated that B.C. was hospitalized for three days (Docket No. 11, pp. 43 of 538).  According to Ms. Cross, B.C. suffers from anxiety, nightmares, and anger related issues stemming from the abuse (Docket No. 11, pp.42-43 of 538).

Ms. Cross also described B.C.'s academic difficulties noting B.C. had been bullied regularly and

struggled with school related pressures.  Ms. Cross noted B.C. suffers from dysgraphia, a learning disability which affects his ability to write legibly.  According to Ms. Cross, B.C. difficulties dealing  with school related pressures and bullying ultimately reached a point where B.C. became fearful of school and refused to attend.  Ms. Cross noted her difficulties trying to get B.C. on the bus each morning and the resulting conflict it caused between the two (Docket No. 11, pp. 44-45 of 538).

Ms. Cross testified that two weeks before the hearing she had enrolled B.C. in a home schooling program in order to improve his life and to prevent him from failing out of school (Docket No. 11, pp. 44-45; 54 of 538).  Ms. Cross indicated that since enrolling B.C. in home school she has noticed an improvement, which she credited to his use of the computer and the elimination of the school related pressures he faced in the traditional school environment (Docket No. 11, pp. 46-47 of 538).  She also noted that she had spoken to B.C.'s home schooling instructors and been informed that B.C. was doing well in all of his classes (Docket No. 11, pp. 54 of 538).

In addition to the issues at school, Ms. Cross detailed the issues he has been having at home since the abuse (Docket No. 11, pp. 44 of 538).  She noted B.C. acts out in fits of anger, which includes yelling, throwing things, and expressing his rage in a verbal manner (Docket No. 11, pp. 44 of 538).  She recalled instances in which these angry fits resulted in B.C. storming out of the house, taking a walk to cool off, or caused him to break down crying (Docket No. 11, pp. 50-51 of 538).

Ms. Cross also described B.C.'s ability to care for himself and indicated that B.C. must be reminded to maintain basic hygiene (Docket No. 11, pp. 43 of 538).  She testified that she believes her son lacks the ability to think rationally and noted she no longer feels comfortable leaving B.C. home alone.  Ms Cross noted that B.C. had failed to lock doors, left water running, and almost burned the house down (Docket No. 11, pp. 45-46 of 538).

With respect to treatment and medication, Ms. Cross testified that B.C. had been under the care of a

3

psychiatrist, whom he sees once a month, for the last two and a half years (Docket No. 11, pp. 48 of 538). She indicated B.C. takes Zoloft, Wellbutrin, Abilify, and Trazodone medications (Docket No. 11, pp.46 of 538). In addition to being under the care of a psychiatrist, Ms. Cross noted B.C. also sees a psychologist and his case worker on a weekly basis to address his anger issues and improve his social skills (Docket No. 11, pp. 48 of 538). When asked whether the treatment was effective, Ms. Cross testified that while the psychologist and caseworker are providing B.C. with tools to cope with his issues, he still struggles to properly apply them at the appropriate times (Docket No. 11, pp. 51-52 of 538). She noted that B.C. still experiences anger and emotional outbursts (Docket No. 11, pp. 51-52 of 538). Ms. Cross also indicated that the medication has lowered B.C.'s anxiety level but has not kept him stable (Docket No. 11, pp. 52-53 of 538).

When asked about B.C.'s behavior at school, Ms. Cross testified that B.C. had always been respectful at school (Docket No. 11, pp. 55 of 538). She opined that the behavioral issues occurring in the home were the result of B.C. feeling comfortable in front of her and being angry at her for not having saved him from the earlier abuse (Docket No. 11, pp. 55 of 538).

### 2.    B.C.'s Testimony

Following his mother's testimony, B.C. testified that he was fourteen years of age and in the eighth grade (Docket No. 11, pp. 59 of 538). He noted his preference for home schooling, explaining it was less stressful and he felt safe (Docket No. 11, pp 60 of 538). B.C. also noted that at home school he did not have to worry about being bullied by other kids because of the clothes he wore (Docket No. 11, pp. 60-61; 68 of 538). B.C. testified that the bullying reached a point where he no longer wanted to attend school, which resulted in daily conflict with his mother (Docket No. 11, pp. 60-61; 67-69 of 538).

In terms of his academics, B.C. noted his favorite school subject is science because of the activities (Docket No. 11, pp. 61 of 538). He favors typing his school assignments on the computer over writing them

out by hand because of his handwriting difficulties (Docket No. 11, pp. 60-61 of 538).  B.C. testified that he had enjoyed being involved in the 4H club and working with animals (Docket No. 11, pp. 62-63 of 538). B.C. noted that in his free time he occasionally plays football with other kids in the neighborhood and enjoys fishing (Docket No. 11, pp. 63-67 of 538).  With respect to his interactions and closeness with family, B.C. told the ALJ that he gets along with a cousin he sees twice a year (Docket No. 11, pp. 67 of 538).

On the topic of his behavior, B.C. testified that he had gotten into physical and verbal altercations in school (Docket No. 11, pp. 69-71 of 538).  He reported receiving a few detentions in school for failing to complete assignments but nothing for fights (Docket No. 11, pp. 70-71 of 538).   In response to questions about his ability to care for himself, B.C. testified that he was able to get himself ready for school and could cook food in the microwave (Docket No. 11, pp. 71 of 538).  The ALJ asked B.C. about playing with fire and B.C. noted no explanation for his interest in fire, but indicated it was foolish and reported discussing the behavior with his counselors (Docket No. 11, pp. 73-74 of 538).

B.C. was also asked about his feelings concerning his prescribed medications (Docket No. 11, pp. 74-75 of 538).  B.C. told the ALJ that the medications make him feel different because he does not know anyone else who takes them (Docket No. 11, pp. 75 of 538).  When asked whether the medications make him feel better or worse, B.C. stated that they made him feel better because he sleeps (Docket No. 11, pp. 75 of 538).

B.      MEDICAL EVIDENCE

1.      DR. SAMUEL J. DAISLEY, D.O.

The earliest documented medical treatment related to B.C.'s prior sexual abuse was an examination by Dr. Daisley on February 9, 2009.  The treatment notes from the visit indicate that B.C. complained of a cough, but there is also a notation that B.C. has been a victim of sexual abuse.  Dr. Daisley's notes indicate that B.C. was going to start counseling as soon as possible (Docket No. 11, pp. 429-430 of 538).

5

2.    DR. KRISHNA DEVULAPALLI, M.D., D.E.A.

B.C. first saw Dr. Devulapalli on March 1, 2010, for a psychiatric evaluation related to his prior

sexual abuse.  The notes from that evaluation detail B.C.'s history of sexual abuse dating back to age six

and indicated that he had been in counseling with a therapist for a year, but that it had not helped him.

Dr. Devulapalli noted that B.C.'s mother (Ms. Cross) complained B.C. was argumentative, disorganized,

forgetful, unmotivated, and had made suicidal statements.  Dr. Devulapalli diagnosed B.C. with Major

Depressive Disorder and Post Traumatic Stress Disorder (PTSD).  She prescribed him Celexa 10 mg and

discussed a treatment plan which included additional outpatient counseling (Docket No. 11, pp. 328 of

538).

On March 22, 2010, B.C. again saw Dr. Devulapalli after Ms. Cross reported that he had been

playing with fire and complained that B.C. lacked motivation, was irritable and argumentative (Docket

No. 11, pp. 327 of 538).  Based Dr. Devulapalli's evaluation,  B.C. was admitted to Belmont Pines

Hospital for observation and evaluation noting a concern for B.C.'s dangerouness (Docket No. 11, pp.

327; 307 of 538).

A.    INPATIENT HOSPITALIZATION

On March 23, 2010, B.C. underwent a psychiatric examination, which concluded that he was

suffering from severe symptoms of PTSD and was a potential risk of harm to himself and others (Docket

No. 11, pp. 290; 300 of 538). Dr. Pradeep Mathur, MD., F.A.P.A., ordered inpatient therapy and made

modifications to B.C.'s medications (Docket No. 11, pp 290; 300; 286 of 538).  During a follow-up

examination on March 25, 2010, hospital records note that B.C. had improved and was participating more

effectively in therapy (Docket No. 11, pp 287; 303-304 of 538).  On March 26, 2010, Dr. Mathur noted

that B.C.'s medications were effectively controlling his symptoms and that B.C. was no longer a risk to

himself or others (Docket No. 11, pp. 287; 305-306 of 538).  Dr. Mathur recommended outpatient

6

treatment, medication management, and noted that B.C.'s prognosis was good (Docket No. 11, pp. 287; 306 of 538).

###### B.    OUTPATIENT PROGRESS CHECKS AND MEDICATION REVIEWS

On April 12, 2010, B.C. returned to Dr. Devulapalli for a progress check and medication review (Docket No. 11, pp. 388 of 538).  Between April 12, 2010 and October 17, 2011, B.C. made numerous visits to Dr. Devulapalli for progress checks and medication reviews as summarized below:

- <u>April 12, 2010</u> - Ms. Cross complained that B.C. was hyperactive and experiencing mood swings. Dr. Devulapalli noted that B.C. was relatively cooperative, but reserved in discussions about his mood.  B.C. had no suicidal ideations, delusions or hallucinations. Dr. Devulapalli made a note that she wondered if B.C. was becoming bipolar.  Dr. Devulpalli discontinued B.C. on his Clonidine medication, replacing it with Seroquel 50 mg and changed his dosage of Celexa to 20 mg (Docket No. 11, pp. 388 of 538).

- <u>May 12, 2010</u> - Ms. Cross complained that B.C. was argumentative, disrespectful, irritable, agitated, having trouble sleeping, and had gotten into fights at school. Dr. Devulapalli described B.C. as relatively cooperative in their session.  She noted B.C. admitted to being irritable on occasion and suffering from mood swings.  B.C. denied suicidal ideations, delusions or hallucinations.  Dr. Devulapalli noted major depressive disorder with rule-out Bipolar II Disorder and PTSD.  B.C.'s dosage of Seroquel was increased to 100 mg and his Celexa dosage was maintained at 20 mg (Docket No. 11, pp. 387 of 538).

- <u>May 28, 2010</u> - Ms. Cross reported that B.C. was not sleeping well, was easily agitated, and irritable.  Dr. Devulapalli indicated that B.C. was in a better mood during their session, and had not suffered from any depression, delusions, hallucinations or suicidal ideations.  The record of the session noted B.C.'s history of mood disorder and the appearance of Bipolar Disorder complicated by PTSD.  B.C.'s Seroquel medication was modified in favor of Seroquel XR 150 mg and his Celexa was maintained at 20 mg dosage (Docket No. 11, pp. 386 of 538).

- <u>June 25, 2010</u> - Ms. Cross reported noticing improvement since having adjusted B.C.'s Seroquel medication, but complained that B.C. was still defiant, irritable, and staying up too late.  Dr. Devulapalli described B.C. as cooperative and noted that B.C. was claiming his moods were improving.  B.C. denied experiencing delusions, hallucinations or thoughts about harming himself or others.  The record of the session again reflected B.C.'s history of mood disorder and PTSD. Dr. Devulapalli increased B.C.'s dosage of Seroquel to 200 mg and maintained his Celexa dosage at 20 mg. (Docket No. 11, pp. 385 of 538).

- <u>July 23, 2010</u> - Ms. Cross complained she was unhappy with B.C.'s behavior and unable to deal with him.  She also complained B.C. was easily agitated and irritable.  B.C. reported having difficulties sleeping. Dr. Devulapalli noted B.C. was quiet during their session, but did not express

delusions, hallucinations, suicidal or homicidal ideations. Dr. Devulapalli prescribed Trazodone 50 mg and maintained B.C.'s dosage levels on his Celexa and Seroquel medications (Docket No. 11, pp. 384 of 538).

- August 20, 2010 - Ms. Cross expressed an inability to deal with B.C. and complained he was disrespectful and eating excessively. Dr. Devulapalli described B.C. as quiet and noted he admitted to being irritable and experiencing mood swings. B.C. did not express delusions or hallucinations and he denied any thoughts about harming himself or others. Dr. Devulapalli reduced B.C.'s Seroquel XR dosage to 150 mg, prescribed Abilify 5 mg, and maintained his Celexa and Trazodone medications at the same dosage levels (Docket No. 11, pp 383 of 538).

- September 27, 2010 - Dr. Devulapalli noted Ms. Cross seemed better able to handle B.C. as a result of the Abilfy medication. During the session, Ms. Cross complained B.C. was unable to sleep. B.C. complained about having racing thoughts. The notes from the appointment detail improvements, noting B.C.'s claims of better focus at school and improving grades. B.C. reported no depression or suicidal ideations. Dr. Devulapalli increased B.C.'s Abilify dosage to 10 mg and maintained his Seroquel, Celexa, and Trazodone medications at the same dosage levels (Docket No. 11, pp. 457 of 538).

- December 6, 2010 - The record of the session indicates that B.C. was not doing well, had refused to go to school, and notes that his mother had called a truancy officer. Ms. Cross complained B.C. was unmotivated and indicated she and B.C. had argued over his school work. Dr. Devulapalli's comments noted that B.C. had not engaged in any dangerous behavior, was cooperative during the session, and that he did not have any depression or suicidal ideations. Dr. Devulapalli altered B.C.'s medication, discontinuing Celexa and replacing it with Wellbutrin SR 150 mg. B.C.'s Seroquel and Trazodone medications were maintained at the same dosage levels (Docket No. 11, pp. 456 of 538).

- February 18, 2011 - Ms. Cross complained B.C. struggled with anxiety and irritability. She noted B.C. had refused to go to school and was fearful of one of his teachers because the teacher reminded B.C. of his father. Dr. Devulapalli noted B.C. was cooperative, his mood anxious and irritable, but he was not having delusions, hallucinations or suicidal ideations. Dr. Devulapalli maintained B.C.'s current medications and dosage levels and noted that B.C.'s mother was going to meet with B.C.'s teacher to discuss B.C.'s anxiety and insecurities (Docket No. 11, pp. 455 of 538).

- March 23, 2011 - Ms. Cross expressed concern about B.C.'s increased appetite and weight gain, but had no complaints concerning B.C.'s behavior. It was noted that B.C. was having difficulty getting up in the morning and lacked desire to attend school. B.C. reported getting bored easily and having a tendency to snack. Dr. Devulapalli described B.C. as cooperative, having better moods and denying depression or suicidal ideations. Dr. Devulapalli reduced B.C.'s dosage of Seoquel to 50 mg to see how he responded and maintained the other medications at the same dosage levels (Docket No. 11, pp. 454 of 538).

- August 8, 2011 - In the time that had lapsed since his prior March 23, 2011 visit, the notes

8

indicate that B.C. continued taking all of his medications with the exception of Seroquel, which his mother eliminated from his medication regimen. Ms. Cross complained B.C. could not focus and had been sleeping up to 14 hours. The record indicated that B.C. had been seeing Psychologist Joe Cancillere. Dr. Devulapalli described B.C. as mostly quiet and noted that he nodded in response to questions. B.C. admitted to periodic irritability, trouble focusing and mood changes, but denied thoughts of harming himself or others. Dr. Devulapalli noted that B.C. suffers from Bipolar Disorder complicated by PTSD and indicated there has always been a question concerning whether B.C. has Attention Deficit Hyperactive Disorder (ADHD). B.C.'s Trazodone medication was discontinued, his Wellbutrin dosage was increased to 200 mg, and his Abilify medication was maintained at the same dosage level (Docket No. 11, pp. 453 of 538).

- <u>October 17, 2011</u> - The record of the visit noted that B.C. had refused to attend school and that his mother was increasingly concerned about school truancy charges. B.C. complained of not wanting to be in school and that he felt overwhelmed by school and his assignments. The record of the session also noted B.C. past sexual abuse, his comfort in sleeping excessively, avoiding situations, and poor concentration. Dr. Devulapalli reported B.C.'s mood and affect remained anxious and depressed and that he lacked delusions or hallucinations or suicidal ideation. The record noted B.C. appeared to be having predominantly PTSD. B.C.'s Wellbutrin SR medication was reduced to 150 mg, he was prescribed Zoloft 25 mg to control anxiety and depression, and his Abilify medication was maintained at the same dosage level (Docket No. 11, pp. 527 of 538).

### 3. PSYCHOLOGIST JOE CANCILLIERE, COMMUNITY COUNSELING

According to his Medical Statement, Mr. Cancilliere, began treating B.C. on February 2, 2010, and last saw him on December 2, 2011. Mr. Cancilliere's statement contains checkmarks indicating B.C. suffered from a variety of mood, sleep, self esteem and guilt issues. Mr. Cancilliere also noted B.C. was easily distracted, lacks interest or pleasure in activities, engages in suicidal thoughts or acts, and has recurrent and intrusive memories of a traumatic experience which cause him distress. With respect to B.C.'s level of impairment and general limitations, Mr. Cancilliere marked the categories: deficiencies of concentration, attention and completion of tasks, interactions and relating with others, and caring for himself as being areas of extreme levels of impairment. Mr. Cancilliere classified B.C.'s degree of impairment in social functioning as markedly and noted no impairment in the area of personal functioning. In addition, Mr. Cancilliere marked boxes indicating B.C. has recurrent and severe panic attacks which occur on a daily basis. In his comments, Mr. Cancilliere noted B.C. becomes frustrated and

stressed when pressured to complete tasks such as school work or physical activities in which he has difficulty (Docket No. 11, pp. 524-525 of 538).

Also contained in the case record is an Anger Management Statement completed by Mr. Cancilliere concerning B.C.  The statement indicates a diagnosis of Bipolar I Disorder and lists B.C. prognosis as treatable.  The anticipated length of treatment was listed as until age 18 or longer.  Mr. Cancilliere indicated B.C. is a threat to himself or others when he becomes severely depressed (Docket No. 11, pp. 520 of 538).  Mr. Cancilliere also indicated that over the course of his treatment of B.C. had made statements concerning his anger, self control, depression, and violence (Docket No. 11, pp. 520-522 of 538).

### C.  EDUCATIONAL BACKGROUND

#### 1.  PRIMARY SCHOOL

B.C. attended primary school at Pymatuning Valley Primary Elementary.  His report card for kindergarten through fourth grade reflects good attendance.  The most absences B.C. accrued in a single school year was seven days in the third grade.  With respect to his academic performance, B.C.'s report card only lists grades for the first and fourth grades; however, it does indicate B.C. repeated kindergarten.  B.C.'s academic performance for the two years he was assessed grades reflects difficulties in spelling and handwriting, but indicates he was above average in reading, social studies, art, and science (Docket No. 11, pp. 460 of 538).  The results of B.C.'s Ohio Achievement tests from this time period confirm proficiency or better in reading, math, social studies and science (Docket No. 11, pp. 439; 461; 459 of 538).

#### 2.  SECONDARY SCHOOL

B.C.'s attendance records during the sixth grade school year beginning August 21, 2009, through June 3, 2010, indicate 22 absences (Docket No. 11, pp. 462 of 538).  His report cards reflect above

10

average grades in computer, general music, physical education, science/health, and art, and below

average or failing grades in language, math, reading, and social studies (Docket No. 11, pp. 213-214; 273

of 538).  The comments B.C. received from his teachers suggests poor attitude, effort, and time

management as contributing factors to his poor performance (Docket No. 11, pp. 214 of 538).  B.C.'s

cumulative grade point average at the end of sixth grade was 2.5 (Docket No. 11, pp. 273 of 538).

B.C.'s report cards from the seventh grade shows above average grades in physical education, life

science, history, and art, and below average grades in health, industrial arts, language arts, and math

(Docket No. 11, pp. 450; 459 of 538).  The comments B.C. received from teachers noted improved effort

and performance during the academic year (Docket No. 11, pp. 450; 459 of 538).  B.C.'s cumulative GPA

at the end of the seventh grade was 2.635 (Docket No. 11, pp. 459 of 538).

Records of B.C.'s attendance during his eighth grade year beginning August 29, 2011, through

November 29, 2011, reflect 15 absences from school (Docket No. 11, pp. 461 of 538).  B.C.'s report card

for the first grading period note above average grades in American history, language arts, and pre-algebra

(Docket No. 11, pp. 458 of 538).  In science, B.C. received a C, however his teacher noted that B.C.

showed normal effort and was a pleasure to have in class (Docket No. 11, pp. 458 of 538).  B.C.'s only

below average grade for this grading period was a D he received in business information technology, but

his teacher noted that B.C. showed normal effort in the class (Docket No. 11, pp. 458 of 538).  B.C.'s

grade point average for the grading period was 2.647  (Docket No. 11, pp. 458 of 538).

D.    OCCUPATIONAL AND EDUCATIONAL EVALUATIONS

While enrolled in school, B.C. received special education services.  The case record contains

assessments and evaluations from teachers and medical professionals throughout that time concerning

B.C.'s dysgraphia and scholastic difficulties. B.C.'s school psychologist, Deborah A. Ormston, noted

B.C.'s testing history in her Individual Evaluator Assessment (IEA) from October 15, 2009.  She noted

that after B.C. repeated kindergarten, he was placed into a transitional class between kindergarten and first grade.  In first grade, B.C. received the assistance of an OhioReads tutor.  On May 31, 2005, B.C. was given a multifactor evaluation to assess whether he qualified for special education services.  The results of the exam indicated that B.C. did not qualify as a student with a learning disability  (Docket No. 11, pp. 256-257 of 538).

### 1.   DR. SUSAN KLEIN, M.D.

On April 18, 2006, B.C. was seen at University Hospitals for a neurological consultation with Dr. Klein on recommendation of B.C.'s family doctor and his school.  The records of the consultation indicate that B.C. was having scholastic difficulty.  Dr. Klein noted reviewing handwriting samples, an intake form, and B.C.'s report card for the 2005-06 school year.  Dr. Klein documented B.C.'s difficulties writing information and diagnosed him with dysgraphia, a cognitive and fine motor disorder affecting his ability to convert thoughts into written information.  With the exception of B.C.'s writing and some difficulty in math, Dr. Klein noted an otherwise remarkable educational history despite having repeated kindergarten.  Dr. Klein recommended that B.C. undergo occupational therapy evaluation and support, and that accommodations be made for his dysgraphia. (Docket No. 11, pp. 380-382 of 538).

Based on Dr. Klein's evaluation and recommendations, B.C. was given a new multifactor evaluation on May 9, 2006.  Ms. Ormston noted the results of the second evaluation were similar to B.C.'s first evaluation in May 2005.  The results indicated B.C. was functioning within the expected parameters for his ability in most of the subjects tested and was above the expectancy levels for oral language and reading.  Ms. Ormston noted B.C.'s difficulties with writing at school and the evaluation team recommended that B.C. receive an Individualized Education Program (IEP) with accommodations and modifications in the classroom (Docket No. 11, pp. 257 of 538).

### 2.   DR. MARK S. SCHER, M.D.

12

On August 4, 2008, B.C. was again evaluated at University Hospitals, this time by Dr. Scher, a pediatric neurologist, for ADHD. Ms. Cross (B.C.'s mother) complained of continued scholastic problems. Dr. Scher's notes from the consultation indicate that after examining B.C., he suspected B.C. suffered from a learning disability and delayed any recommendation concerning medication until the school performed additional testing of B.C. (Docket No. 11, pp. 378-379 of 538).

School records indicate B.C. was given an occupational therapy evaluation and written assessment at the request of B.C.'s mother. The results of the assessment determined he was eligible for services as a student with a learning disability. The school provided B.C. with occupational therapy for an hour a week (Docket No. 11, pp. 257 of 538).

### 3. INDIVIDUAL EDUCATION PLANS AND ASSESSMENT TESTING

In October 2009, Ms. Ormston indicated B.C. was given the Wechsler Individual Achievement Test-II (WIAT-III). B.C. was described as a friendly boy who was cooperative throughout testing. Ms. Ormston noted that B.C. attempted all of the items he was given and demonstrated effort on everything, but the Essay Composition portion of the test, in which he displayed minimal effort. Ms. Ormston's Assessment noted B.C.'s writing quality was poor and difficult to read. Her summary indicates B.C. tested at an age appropriate reading level, functioned at an age appropriate level in math reasoning, but showed a discrepancy in his ability and achievement in math calculation. Ms. Ormston noted that B.C. showed considerable improvement in spelling skills and had achieved an age appropriate score; however, she also noted B.C.'s written expression fell into the low average range (Docket No. 11, pp. 258 of 538). Ms. Ormston recommended providing B.C. with alternative methods for expressing his knowledge, such as permitting him to complete written work on a computer (Docket No. 11, pp. 259 of 538).

Brenda Ziegler, B.C.'s Occupational Therapist, also completed an assessment and testing summary, which noted B.C.'s skills in visual motor integration and coordination, as below average. She

indicated B.C. has decreased hand manipulation skills, difficulty with handwriting, and that his work is difficult to read. Ms. Ziegler's comments indicated that B.C. requires moderate verbal redirection to complete his work when in a group therapy setting. Ms. Ziegler noted B.C. functioned at an age appropriate level and recommended discharging occupational therapy because his fine motor, visual motor, perception and coordination skills were adequate (Docket No. 11, pp. 260-261 of 538).

B.C.'s teachers in the subjects of social studies, language arts, science and math all completed IEAs in October 2009. Their assessments indicated B.C. has difficulty staying focused and was easily distracted. (Docket No. 11, pp. 262-264; 265 of 538). Ms. Sue Beck, B.C.'s language arts and reading teacher, noted B.C.'s difficulties following directions, staying organized, and completing assignments (Docket No. 11, pp. 262 of 538). Not all of the IEAs completed concerning B.C. were negative. B.C.'s science teacher, Mr. Wludyga described B.C. as showing a high level of academic achievement in science and noted B.C. understands concepts easily and has applicable knowledge obtained outside of the classroom (Docket No. 11, pp. 263 of 538).

The team evaluation summary recommended B.C. take more time in completing written assignments and homework, and apply better organizational skills and efforts to academic tasks. B.C.'s teachers indicated that B.C. was capable of more than he had demonstrated and he was encouraged to utilize the "AlphaSmart" tools the school had provided him to complete his school work (Docket No. 11, pp. 266 of 538). B.C.'s IEP set an annual goal of maintaining passing grades in all academic classes. Two measurable objectives were defined for B.C., including maintaining an assignment book independently for five days per week and completing daily assignments on time (Docket No. 11, pp. 276-278 of 538). The IEP recommended accommodations for B.C. on lengthy assignments, including use of a scribe and being permitted additional time to complete assignments (Docket No. 11, pp. 279 of 538). The IEP also noted that during district and state wide testing B.C. would be permitted a scribe and extended

14

time in reading and math (Docket No. 11, pp. 281 of 538).

Annual reviews of B.C.'s IEPs were conducted in October 2010 and 2011 (Docket No. 11, pp. 440; 466 of 538). Ohio Achievement Test results for both years showed proficiency or better in reading and math, and documented B.C.'s difficulty with written expression and math calculations (Docket No. 11, pp. 441; 466 of 538).  Educational objectives for improvement during both years focused on organization, completing assignments, writing more legibly, communication skills, and improving B.C.'s writing and math calculation skills (Docket No. 11, pp. 443; 469-470 of 538). The written comments from his 2010 IEP review noted B.C.'s difficulties maintaining focus, completing assignments, and staying organized (Docket No. 11, pp. 441-443 of 538).  Attitude and poor effort were blamed as factors contributing to poor grades received in math, reading, and language arts; however, it was noted that B.C. was capable of completing the work, but had failed to do so on a consistent basis (Docket No.11, pp. 441 of 538).  Accommodations were noted for B.C. during both school years with respect to written work, including use of the computer, a scribe, and extended time deadlines for turning in assignments (Docket No. 11, pp. 444; 446; 471-473 of 538).

A Functional Assessment Questionnaire was completed for B.C. in December 2011 (Docket No. 11, pp. 499-501 of 538).[1]  The assessment notes that B.C. has a Specific Learning Disability in language arts, written expression, and mathematics calculation.  B.C.'s domain limitations were assessed as marked in the domains of Acquiring and Using Information, and Attending and Completing Tasks and as moderate in the domain of Interacting and Relating with Others.  The remaining domains were graded with no limitation (Docket No. 11, pp. 499-501 of 538).

---

[1] The Functional Assessment is marked to the attention of Mrs. Smiley, B.C.'s Intervention Specialist, however it is unclear as to who completed the paperwork because it contains the signatures of an examiner, Darla Simmons, Mrs. D. Smiley, and a tutor, Becka Sempson.

**4.**    TEACHER QUESTIONNAIRE AND THIRD PARTY STATEMENTS

B.C.'s teacher for reading, language, spelling, and social studies, Ms. Sue Beck, completed a Teacher Questionnaire (Social Security Form SSA-5665-BK), which was signed and dated April 28, 2010.  She indicated she has known B.C. for eight months and saw him for three periods each school day (Docket No. 11, pp. 339 of 538).  In the form she provided her assessment concerning each of the six functional domains. She noted B.C. had some level of difficulty in each of the six functional domains. Among those problems, Ms. Beck commented about B.C.'s difficulty focusing, his distraction to other students, and difficulty providing examples or explanations (Docket No. 11, pp. 340-346 of 538).

Statements are also included in the case record from B.C.'s grandmother, mother, and a friend. B.C.'s grandmother, Ms. Myrtle Cross, noted that B.C. exhibited symptoms including depression, anxiety, panic, overeating, and suicidal thoughts.  She checked boxes on the form indicating that B.C. has marked limitations in daily living and social functioning as a result of his mental impairments (Docket No. 11, pp. 240-241 of 538).

B.C.'s friend, Geoffrey Wright, also marked boxes indicating he had observed B.C. show symptoms of depression, anxiety, panic, and fear.  Mr. Wright noted marked limitations in daily living and extreme limitations in social functioning.  His comments on the bottom of the questionnaire reported that B.C. struggled with normal activities including getting ready for school and had difficulty focusing among other issues (Docket No. 11, pp. 243-244 of 538).

B.C.'s mother Ms. Mary Cross, noted that B.C. hated school, lacked focus, was irresponsible and suffered from a long list of depressive symptoms.  She noted that B.C. experiences flashbacks, freaks out, and requires help throughout the day.  Ms. Cross also commented that B.C. lacks self esteem, and suffers from daily panic attacks caused by his fear of school. (Docket No. 11, pp. 246-247 of 538).

**E.**    AGENCY DETERMINATIONS

16

## 1. DR. PAUL TANGEMAN, PH.D.

B.C.'s case was first reviewed by psychologist Paul Tangeman, on behalf of the Social Security Administration.  The Disability Determination Explanation form outlines the evidence received by the agency, the alleged impairments, the factors Dr. Tangeman was required to consider, and the findings of fact and analysis of evidence. After considering the relevant evidence and factors, Dr. Tangeman concluded B.C. has less than marked limitations in the domain of Acquiring and Using Information; marked limitations in the domain of Attending and Completing Tasks; and no limitations in the domains of Interacting and Relating to Others, Moving About and Manipulation of Objects, Caring for Yourself, and Health and Well-Being.  Therefore, Dr. Tangeman determined that B.C.'s impairment or combination of impairments does not functionally equal the listing limitations and B.C. does not qualify as a disabled child (Docket No. 11, pp. 80-83 of 538).

## 2. DR. BRUCE GOLDSMITH, PH.D.

Upon reconsideration, Psychologist Dr. Bruce Goldsmith reviewed B.C.'s case (Docket No. 11, pp. 85-93 of 538).  The Disability Determination Explanation form reflects Dr. Goldsmith's reconsideration analysis, the factors considered in an analysis of the claim, and domain evaluations.  Dr. Goldsmith determined B.C. had marked limitations in the domain of Attending and Completing Tasks; and less than marked limitations in the domains of Acquiring and Using Information; Interacting and Relating With Others; and Caring for Yourself.  With respect to the domain of Health and Physical Well-Being, Dr. Goldsmith determined that B.C. had no limitation in this domain.  Therefore, Dr. Goldsmith concluded that B.C. did not have an impairment or combination of impairments that functionally equal the listings (Docket No. 11, pp. 85-93 of 538).

## III. STANDARD OF DISABILITY

For an individual under the age of 18 to be considered disabled, that individual must have a

medically determinable physical or mental impairment, which results in marked and severe functional

limitations, which can be expected to result in death or which has lasted or can be expected to last for a

continuous period of not less than 12 months. 42 U.S.C. § 1382c(C)(i) (West 2014). An individual under

the age of 18 who engages in substantial gainful activity (determined in accordance with regulations

prescribed pursuant to subparagraph (E)) may be considered to be disabled. 42 U.S.C. § 1382c(C)(i)(ii)

(West 2014).  For purposes of this paragraph, a physical or mental impairment is an impairment that

results from anatomical, physiological, or psychological abnormalities which are demonstrable by

medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. § 1382c(D) (West 2014).

The Social Security Act sets forth a three-step process for determining whether a child under the

age of 18 is disabled. *See* 20 C.F.R. § 416.924(a) (West 2014). The first step requires the fact finder to

consider whether a child is working and whether such work is substantial gainful activity. 20 C.F.R. §

416.924(b) (West 2014).  Substantial gainful activity is generally defined as work activity that involves

significant physical or mental activities, even if done on a part time basis, usually for pay or profit. *See* 20

C.F.R. § 416.972 (West 2014).  If the fact finder determines the child is engaged in substantial gainful

activity, the child will not be found disabled, regardless of medical condition, age, education or work

experience. C.F.R. § 416.924(b) (West 2014).

The second step in the analysis requires the fact finder to consider whether the child has a

medically determinable impairment or combination of impairments that is severe. 20 C.F.R. § 416.924(c)

(West 2014). If the medically determinable impairment(s) is a slight abnormality or a combination of

slight abnormalities which causes no more than minimal functional limitations, the fact finder must find

that the child does not have a severe impairment(s) and is, therefore, not disabled. *Id.*

The third and final step in the analysis requires that the child's impairment(s) medically equal or

functionally equal the listings. 20 C.F.R. § 924(d) (West 2014).  An impairment(s) causes marked and

severe functional limitations if it meets or medically equals the severity of a set of criteria for an impairment in the listings, or if it functionally equals the listings. *Id.*  Therefore, an impairment(s) that meets or medically equals the requirements of a listing or that functioning equals the listing, and that meets the duration requirement will result in a finding that a child is disabled. 20 C.F.R. § 924(d)(1) (West 2014).  If however, a child's impairment(s) does not meet the duration requirement, or does not meet, medically equal, or functionally equal the listings, the child will not be found disabled. 20 C.F.R. § 924(d)(2) (West 2014).

If a child has a severe impairment or combination of impairments that does not meet or medically equal any listing, the fact finder will determine whether the impairment results in limitations that functionally equal the listings. 20 C.F.R. § 416.926a(a) (West 2014).  In other words, the impairment(s) must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. 20 C.F.R. §§ 416.926a(a) & (d) (West 2014). The regulations indicate that the fact finder will look at all the information in the case record about how a child's functioning is affected during all of the child's activities. 20 C.F.R. § 416.926a(b) (West 2014).  The activities consist of everything the child does at home, school, and in their community and are compared to the performance of other children at the same age who do not have the impairments. *Id.*  The regulations list these activities in terms of six domains: 1) Acquiring and Using Information; 2) Attending and Completing Tasks; 3) Interacting and Relating with Others; 4) Moving About and Manipulating Objects; 5) Caring for Yourself; and 6) Health and Physical Well-Being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi) (West 2014).

The regulations define a "marked limitation" as an impairment(s) that interferes seriously with a child's ability to independently initiate, sustain or complete activities. 20 C.F.R. § 416.926a(e)(2) (West 2014).  The child's day-to-day functioning may be seriously limited when the impairment(s) limits only one activity or when the interactive and cumulative effects of the impairment(s) limit several activities.

19

*Id.* In addition, the regulations also provide that "marked limitation" also means a limitation that is "more than moderate" but "less than extreme." *Id.* It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean. *Id.* For a child under the age of 18, a "marked" limitation is a valid score that is two standard deviations or more below the mean, but less than three standard deviations, on a comprehensive standardized test designed to measure ability or functioning in that domain, and the child's day-to-day functioning in domain related activities is consistent with that score. 20 C.F.R. § 416.926a(e)(2)(iii) (West 2014)

The term "extreme" limitations is defined as an impairment(s) that interferes very seriously with a child's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(3)(i) (West 2014) Day-to-day functioning may be very seriously limited when the child's impairment(s) limit only one activity or when the interactive and cumulative effects of the impairment(s) limit several activities. *Id.* "Extreme" limitation is also a limitation that is "more than marked." *Id.* It is the rating given to the worst limitations, but does not necessarily mean a total lack or loss of ability to function. *Id.* It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean. *Id.* For a child under the age of 18, the fact finder will determine an "extreme" limitation if a child has a valid score that is three standard deviations or more below the mean on a comprehensive standardized test designed to measure ability or functioning in that domain, and the child's day-to-day functioning in domain-related activities is consistent with that score. 20 C.F.R. § 416.926a(3)(iii) (West 2014).

## IV. THE ALJ'S FINDINGS

The ALJ made the following findings:

1.      The claimant was born on June 6, 1997. Therefore, he was a school-age child on April 1,

20

2010, the date the application was filed, and is currently a school-age child.

2.  The claimant has not engaged in substantial gainful activity at any time relevant to this decision.

3.  The claimant has the following severe impairments: dysgraphia; depression; anger issues.

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.  The claimant does not have an impairment or combination of impairments that functionally equals the listings.
    - Claimant has less than marked limitation in acquiring and using information.
    - Claimant has marked limitation in attending and completing tasks.
    - Claimant has less than marked limitation in interacting and relating to others.
    - Claimant has less than marked limitation in the ability to care for himself
    - Claimant has no limitation in health and physical well-being.

6.  The claimant has not been disabled, as defined in the Social Security Act, since April 1, 2010, the date the application was filed.

## V. STANDARD OF REVIEW

This Court exercises jurisdiction over the Commissioner's final decision pursuant to 42 U.S.C. §

405(g). *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 832-33 (6th Cir. 2006). In conducting

judicial review, this Court must affirm the Commissioner's conclusions unless the Commissioner failed to

apply the correct legal standard or made findings of fact that are unsupported by substantial evidence. *Id.*

(citing *Branham v. Gardner*, 383 F.2d 614, 626-27 (6th Cir. 1967)). "The findings of the [Commissioner]

as to any fact if supported by substantial evidence shall be conclusive . . ." *McClanahan*, 474 F.3d at 833

(citing 42 U.S.C. § 405(g)). "Substantial evidence is more than a scintilla of evidence but less than a

preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *McClanahan*, 474 F.3d at 833 (citing *Besaw v. Sec'y of Health and Human Servs.*, 966 F.2d

1028, 1030 (6th Cir. 1992)). "The findings of the Commissioner are not subject to reversal merely

because there exists in the record substantial evidence to support a different conclusion . . . This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *McClanahan*, 474 F.3d at 833 (citing *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir.2001) (citations omitted)).

## VI. DISCUSSION

Plaintiff contends that the ALJ erred in finding B.C. less than marked in the domain of Interacting and Relating with Others and presents a two-pronged supporting argument: 1) the evidence supports a finding that B.C. has a marked limitation in this functional domain and 2) the ALJ failed to justify her finding otherwise (Docket No. 16, pp. 9; 11 of 14).

Defendant disagrees and contends that the ALJ's decision is consistent with the statutory and regulatory scheme for evaluating disability claims in children (Docket No. 17, pp. 8-10).  Defendant also contends that the ALJ's determination was supported by substantial evidence (Docket No. 17, pp. 10 of 16).

Plaintiff first argues that the ALJ erred in failing to find that B.C. has a marked limitation in the domain of Interacting and Relating with Others.  On appeal of a disability determination the ALJ's conclusion cannot be reversed so long as it is supported by substantial evidence. *Jones v. Comm'r of Soc. Sec.*, 336 F.d 469, 477 (6th Cir. 2003); *Jackson v. Comm'r of Soc. Sec.*, 2013 WL 6797698, at *7 (N.D. Ohio 2013).  In other words, even if substantial evidence supports a finding contrary to the ALJ's, the Court cannot reverse the decision. *Id.*  Therefore, the Court's scope of review is limited to determining whether substantial evidence supports the finding of the Commissioner and whether the Commissioner applied the correct legal standards.

"The burden of proof at Step Three of the sequential entitlement to children's social security benefits rests with Plaintiff." *Woodall v. Colvin*, 2013 WL 4710516, at *10 (N.D. Ohio 2013), (citing

*Franklin v. Comm'r of Soc. Sec.*, 2012 WL 727799, at *1 (N.D. Ohio 2012)).  An ALJ must "nevertheless provide articulation of step three findings that will permit meaningful review of those findings." *Id.* Courts within this district have noted that "a district court cannot uphold an ALJ's decision, even if there 'is enough evidence in the record to support the decision [where] the reason given by the trier of fact do not build an accurate and logical bridge between the evidence and the result.'" *Salah v. Comm'r of Soc. Sec.*, 2013 WL 3421835, at *5 (N.D. Ohio 2013), (quoting *Sarchet v. Chater*, 78 F.3d 305, 207 (7th Cir. 1996), accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. 2012) ("If relevant evidence is not mentioned, the Court cannot determine  if it was discounted or merely overlooked")); *see also Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011).

Plaintiff cites *Lowery v. Comm'r of Soc. Sec.*, 55 Fed.Appx. 333, 339 (6th Cir. 2003)(unpublished), in arguing that the ALJ's decision, with respect to the domain of Interacting and Relating with Others, is insufficient and deprives a reviewing a court the opportunity to conduct a meaningful review of the analysis (Docket No. 16, pp 11-13 of 14).  Plaintiff contends that the ALJ's findings for this domain consists of selectively cited evidence and lacks sufficient justification for why the cited evidence is more compelling than conflicting evidence not otherwise addressed by the ALJ in her decision on this domain (Docket No. 16, pp 11 of 14).

In *Lowery*, the Sixth Circuit reversed and remanded the SSI case of an eleven-year old girl, determining that the ALJ's decision concerning the child's functional impairment was not based on substantial evidence because the ALJ based his decision on the partial testimony of the child's mother and a check-off form filled out by the child's teacher. *Lowery*, 55 Fed.Appx. at 334.  In the decision, the Sixth Circuit recognized that an "ALJ may not take part of a witness's testimony and disregard the rest." *Id.* at 339.  "To the contrary, substantial evidence is determined from the record as a whole." *Id.*  An "ALJ may not select and discuss only that evidence that favors [the ALJ's] ultimate conclusion, but must

articulate, at some minimum level, [the ALJ's] analysis of the evidence to allow the appellate court to trace the path of his reasoning." *Id.* (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)(citations omitted).

In support of the ALJ's decision, Defendant cites and expands upon the evidence addressed by the ALJ in her findings and notes evidence the ALJ did not specifically address in her decision concerning the domain of Interacting and Relating with Others, including records from Dr. Devulapalli's treatment of B.C., Dr. Goldsmith's findings, and Mrs. D. Smiley's conclusions from B.C.'s functional assessment (Docket No. 17, pp. 11-12 of 16).

**A.      Does Substantial Evidence Support the ALJ's Finding**

At the outset of her Step Three analysis of whether B.C. impairments functionally equal the listing, the ALJ indicates that she has carefully considered all of the evidence of record and administrative testimony in accordance with the regulations.  Next, the ALJ summarized both Ms. Cross and B.C.'s testimony from the administrative hearing.  Then, the ALJ asserted that B.C.'s alleged mental impairments were not disabling.  The ALJ reasoned that B.C. responded well to counseling, medication, had a good prognosis for recovery, and noted other evidence that B.C. was cooperative therefore concluding that he was able to interact with others without violence.  The ALJ then asserted that B.C.'s dysgraphia was not disabling.  Her reasoning included Dr. Klein's evaluation that B.C. did not suffer from any neurological abnormalities or reading disorders, B.C.'s average academic performance, and the results of his IQ testing.  The ALJ devoted the next several paragraphs of her decision to assessing the weight she afforded opinion evidence before turning her attention to her functional equivalence analysis for the six domains of function (Docket No. 11, pp. 18-22 of 538).

For the domain at issue, Interacting and Relating with Others, the ALJ defined the domain's considerations, age group descriptors, and examples of difficulties as provided for in the regulations.

24

After carefully laying out the regulatory framework, the ALJ stated her conclusion, which provides:

> <u>The claimant has less than marked limitation in interacting and relating with others.</u>  The claimant had behavior modification strategies in place when he was at school, including sitting near the teacher.  In addition, the claimant's mother stated that the claimant had difficulty accepting criticism or correction.  However, he was cooperative and friendly at his intelligence test and cooperative at the hearing. Thus, I find less than marked limitation in this area. (Exhibit 1E)

(Docket No. 11, pp, 24 of 538). The ALJ's finding with respect to this domain contains references to some evidence, but fails to articulate her analysis, the evidence she considered, the weight she assigned to such evidence, and her application of the evidence under the analytical framework laid out under the regulations.

Without additional analysis, it is unclear whether the ALJ considered all of the relevant evidence. For example, the ALJ indicates that Ms. Cross testified concerning B.C.'s difficulty accepting criticism or correction, but the ALJ makes no reference to other relevant testimony from Ms. Cross that her son is anxious, isolates himself from others, and has social difficulties.  *See* (Docket No. 11, pp.42-44; 46-52 of 538).  These issues are among some of the examples of difficulty identified in the regulations for this domain of function, and while they do not necessarily describe "marked" or "extreme" limitations under the domain, there is no indication that this evidence was considered in the ALJ's analysis of the domain at issue. *See* 20 C.F.R. § 416.926a(i)(3) (West 2014).  The ALJ also referenced B.C.'s behavior modification at school, which was noted on Ms. Sue Beck's teacher questionnaire, however, the ALJ made no reference to Ms. Beck's second comment from the same page of the form which indicated that B.C. had difficulty asking for help on assignments, which is another example of difficulty listed under the Interacting and Relating with Others domain. *See* 20 C.F.R.§ 416.926a(i)(2)(v) (West 2014);  (Docket No. 11, pp. 342 of 538).  It is unclear whether the ALJ's omission of such relevant evidence was the result of sound reasoning or a simple oversight.

25

Accordingly, the undersigned Magistrate recommends that the Court find that the ALJ's Step Three analysis is insufficient with respect to her functional equivalence analysis and finding under the domain of Interacting and Relating with Others.  Courts within this district have reversed and remanded cases where the ALJ failed to provide sufficient analysis of Step Three findings.  *See Reynolds v. Comm'r of Soc. Sec.*, 424 Fed.Appx. 411 (6th Cir. 2011)(reversing and remanding case for ALJ's failure to evaluate the evidence, compare it to the listing, and provide an explained conclusion that would facilitate judicial review); *Woodall v. Comm'r of Soc. Sec.*, 2013 WL 4710516, at * 11 (N.D. Ohio 2013)(reversing and remanding SSI case based on the ALJ's insufficient functional analysis and meets and exceeds analysis); *Mathos v. Comm'r of Soc. Sec.*, 320 F.Supp.2d 613, 614 (N.D. Ohio 2004)(reversing and remanding child SSI case based on ALJ's failure to articulate and address relevant and conflicting evidence in his Step Three functional equivalence analysis); *see also Waller v. Astrue*, 2012 WL 6771844 at *2-5 (N.D. Ohio 2012); *May v. Astrue*, 2011 WL 3490186 at *7-10 (N.D. Ohio 2011).

Given that the ALJ determined that B.C. has marked limitations in the domain of Attending and Completing Tasks, the error in the functional analysis under the domain of Interacting and Relating with Others, is not harmless.  A proper analysis under the functional domain at issue could result in a finding that claimant has a marked limitation under this domain, therefore entitling him to SSI benefits. *See* 20 C.F.R. § 416.926a(a) & (d) (West 2014). Accordingly, the undersigned recommends that the Court find that the ALJ's incomplete Step Three analysis concerning the domain of Interacting and Relating with Others requires remand for further analysis.  On remand, the Magistrate recommends that the ALJ discuss her analysis of the evidence under the regulations set forth under the domain of Interacting and Relating with Others.  Without this analysis, this Court is unable to determine whether substantial evidence supports the Commissioner's findings.

26

## VII. CONCLUSION

For the foregoing reasons, this Magistrate recommends that the decision of the Commissioner be reversed and remanded, pursuant to sentence four of 42 U.S.C. § 405(g).  On remand, the Magistrate recommends that the Commissioner conduct additional Step Three analysis concerning the domain of Interacting and Relating with Others; articulate those findings in a manner that facilitates meaningful review; and make a determination of whether under the new analysis the claimant is entitled to disability benefits.

/s/Vernelis K. Armstrong
United States Magistrate Judge

Date: March 27, 2014

## VIII. NOTICE

Please note that as of this date the Magistrate's report and recommendation attached hereto has been filed.  Pursuant to Rule 72.3(b) of the LOCAL RULES FOR THE NORTHERN DISTRICT OF OHIO, any party may object to the report and recommendations within fourteen (14) days after being served with a copy thereof.  Failure to file a timely objection within the fourteen-day period shall constitute waiver of subsequent review, absent a showing of good cause for such failure.  The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections.  Any party may respond to another party's objections within fourteen days after being served with a copy thereof.

Please note that the Sixth Circuit Court of appeals determined in *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981) that failure to file a timely objection to a Magistrate's report and recommendation foreclosed appeal to the court of appeals.  In *Thomas v. Arn*, 106 S.Ct. 466 (1985), the Supreme Court upheld that authority of the court of appeals to condition the right of appeal on the filing of timely objections to a report and recommendation.